# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-IA-00845-SCT

*GREG ELKINS*

*v.*

*MODENER McKENZIE, WIFE AND NEXT FRIEND*
*OF EDDIE McKENZIE, DECEASED*


| | |
|---|---|
| DATE OF JUDGMENT: | 5/13/2002 |
| TRIAL JUDGE: | HON. MICHAEL R. EUBANKS |
| COURT FROM WHICH APPEALED: | MARION COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | LAWRENCE ELDER HAHN |
| | THOMAS D. McNEESE |
| | WILLIAM C. CALLENDER |
| ATTORNEYS FOR APPELLEE: | DAVID GLEN GALYON |
| | JOHN M. COLETTE |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND RENDERED - 10/30/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH
## NO. 2002-CA-00853-SCT

*MODENER McKENZIE, WIFE AND NEXT FRIEND*
*OF EDDIE McKENZIE, DECEASED*

*v.*

*CITY OF COLUMBIA, MISSISSIPPI, JERRY*
*HOWIE, AND OFFICER PEARLIE HENDRICKS*


| | |
|---|---|
| DATE OF JUDGMENT: | 5/13/2002 |
| TRIAL JUDGE: | HON. ROBERT I. PRICHARD, III |
| COURT FROM WHICH APPEALED: | MARION COUNTY CIRCUIT COURT |

ATTORNEYS FOR APPELLANT:       DAVID GLEN GALYON
                                     JOHN M. COLETTE

ATTORNEYS FOR APPELLEES:       LAWRENCE ELDER HAHN
                                     THOMAS D. McNEESE
                                     WILLIAM C. CALLENDER

NATURE OF THE CASE:             CIVIL - WRONGFUL DEATH

DISPOSITION:                      AFFIRMED IN PART; REVERSED AND
                                     REMANDED IN PART - 10/30/2003

MOTION FOR REHEARING FILED:

MANDATE ISSUED:

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

**STATEMENT OF THE CASE**

¶1.    This civil rights and tort case arises from the April 15, 1997, death of Eddie McKenzie (Eddie) who was shot by Gregory Elkins (Elkins), a City of Columbia police officer. Modener McKenzie (Modener), the wife of Eddie, filed suit on July 14, 1998, against the City of Columbia, Mississippi (the City), police chief Jerry Howie (Howie), and two officers, Elkins and Pearlie Mae Hendricks (Hendricks). The complaint asserted jurisdiction and venue pursuant to 42 U.S.C. § 1983. Modener asserted causes of action pursuant to the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. As to Elkins and Hendricks, the amended complaint alleged unreasonable use of deadly force in violation of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.

¶2.    By order dated December 14, 2001, the circuit judge allowed Modener to amend her complaint. The amended complaint was to provide greater detail of Modener's basis of recovery and to clarify whether the claims were pursuant to 42 U.S.C. § 1983, the Mississippi Torts Claims Act (MTCA) or both. Modener's amended complaint alleged that Elkins

2

maliciously, intentionally, or through gross negligence fired his weapon resulting in the death of Eddie. The complaint also alleged that deadly force was used without a claim of self defense which violated the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments, as well as, aggravated assault and battery, intentional infliction of emotional distress, and loss of consortium. Modener claimed that Howie and the City were vicariously liable for the actions of their officers and there was inadequate or improper supervision and training of the officers. The complaint also alleged negligence and gross negligence for failure to use reasonable care, the conduct amounted to negligent infliction of emotional distress and invasion of privacy, intentional torts of assault, assault and battery, maiming, false imprisonment, trespass, and intentional infliction of emotional distress.

¶3. Following discovery, all defendants moved for summary judgment. On May 13, 2002, the Circuit Court of Marion County, the Honorable Michael R. Eubanks, presiding, granted in part and denied in part the summary judgment motion. The trial court granted summary judgment in favor of the City, Howie, and Hendricks. As to Elkins, however, the trial court denied the motion for summary judgment. The trial court stated:

> The Court finds Modena [sic] has failed to make out a case against the City of Columbia under § 1983 for policies or customs which violated Eddie's Constitutional rights. They are, therefore dismissed. The Court finds that there is no recovery allowed in a § 1983 action on a respondeat superior theory, therefore Chief Jerry Howie is dismissed. The Court finds that Modena [sic] has not made out a case against Hendricks for violating Eddie's Constitutional rights, and therefore, she is dismissed.
>
> The Court finds that Modena [sic] has sufficiently rebutted Elkins' claim of qualified immunity. The Court finds his decision to enter the house and use deadly force against a retreating suspect for the purposes of preventing him from taking a defensive position and not because of an *immediate* threat was objectively unreasonable. Furthermore, the Court finds that the law on the use

3

of deadly force is well founded, clearly established and is a right of which a reasonable person would have been aware.

As to any allegations for non § 1983 claims the trial court stated that:

> Defendants in this case have raised several Mississippi Tort Claims Act defenses, but as Modena [sic] did not bring suit under the MTCA, these defenses are wholly irrelevant, and consequently dismissed. Also dismissed are any and all of Modena's [sic] state law, negligent based tort claims, as these do not rise to the level of a constitutional tort.

Accordingly, the trial court ruled:

> Plaintiff's claims for negligence, gross negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, invasion of privacy, trespass, maiming, false imprisonment, assault and assault and battery are hereby **DISMISSED**, where they do not merge into the § 1983 claim, as they are state law based claims and do not rise to the level of constitutional tort. Modena [sic] can recover for herself and Eddie's heirs damages for his wrongful death if the jury determines Elkins violated Eddie's constitutional rights and is liable for Eddie's death.

In a final judgment the trial court subsequently dismissed with prejudice the claims against the City, Howie, and Hendricks. From these rulings, Modener filed a direct appeal, and we granted Elkins permission to bring an interlocutory appeal, see M.R.A.P. 5.

¶4. Upon review of this case, we affirm the trial court's summary judgment in favor of the City, Howie, and Hendricks. We reverse and render the trial court's denial of summary judgment for Elkins and finding that Modener sufficiently rebutted Elkins' claim of qualified immunity pursuant to 42 U.S.C. § 1983. Also, the trial court's ruling that Modener failed to bring suit pursuant to the Mississippi Tort Claims Act ("MTCA") is without merit and is reversed and remanded. The state law claims are remanded to the trial court for a finding to determine whether a dismissal is proper pursuant to the MTCA or otherwise.

**FACTS**

4

¶5.    Prior to the shooting that claimed Eddie's life, Hendricks with the assistance of Officer C. N. Brumfield investigated a parked car playing loud music. Myjellious McKenzie (Myjellious), Eddie's son and the owner of the car, was at his friend's home sitting on some steps with the friend. Myjellious ran to the car and turned down the music before Hendricks exited her vehicle. After some discussion with Myjellious, the officers left without giving him a ticket.

¶6.    Later Hendricks responded to a call that an officer needed assistance with stopping a vehicle. Myjellious was driving the vehicle. When Hendricks arrived at Myjellious's home, she saw him in handcuffs. Elkins and other officers were already at the house. Initially, Hendricks saw Eddie at the edge of his carport and outside of his house. The officers were taking a camcorder from Myjellious's car, and Eddie seemed upset. Hendricks asked another officer to explain to Eddie why they were taking the camcorder. They explained that they needed it for investigation, and Eddie told them that it belonged to his wife. Eddie then went inside the house to tell his wife about the camcorder.

¶7.    Later, Eddie stood in his doorway and motioned for Hendricks to approach him. Hendricks walked toward Eddie but did not come all the way to the door to speak to Eddie. Eddie complained to Hendricks about the police. While they were speaking, Elkins walked over to them and spoke to Eddie. Shortly thereafter, Brumfield also walked over to them. Then Eddie stepped back in the house, and the storm door closed.

¶8.    Hendricks saw Eddie pick up a silver gun from the counter next to the door and point the gun at the officers. At this point Hendricks stated that she "was standing in the line of it." She yelled "He has a gun." All three officers present, Hendricks, Elkins and Brumfield, drew

5

their weapons. Elkins gave Eddie a "direct command" to put his weapon down. Officers Hendricks and Elkins moved toward the door, and Eddie was ordered to put the gun down. Eddie began to back away from the door.

¶9. Hendricks paused in her advance, and Elkins continued towards the door. Elkins opened the door and entered the house, and Eddie backed up toward the kitchen. Elkins continued to ask Eddie to put his gun down. Hendricks was outside at the threshold of the door at this time and saw Eddie shoot his gun from the kitchen bar. When Eddie fired the gun, Hendricks saw the flash of the barrel and Elkins flinch. She thought that Elkins had been hit by the bullet and entered the house.

¶10. Elkins returned fire toward Eddie. Eddie backed up toward the hallway and a bedroom while Elkins continued to move toward Eddie. Hendricks was unsure how many bullets Elkins fired from his weapon and stated "I can't - - I don't recall. It was just an exchange of gunfire between the two of them." Officer Tim Single (Single) came into the house and told Hendricks to leave the house. Hendricks entered the house a second time only to bring Elkins a flashlight. By this time it was evening, the hallway of the house was dark, and Elkins needed the flashlight to see down the hallway.

¶11. Elkins stated in his deposition that he noticed Eddie motioning for Hendricks to come toward him. Hendricks actually stepped backwards, and these actions caught his attention. Elkins went toward Hendricks and Eddie. The police were going to tow Myjellious's car, but Eddie expressed his dissatisfaction to Elkins. Then, Elkins turned to walk back to the car. Hendricks then hollered "He's got a gun." As Elkins turned, he unholstered his gun. When asked when was the first time that he felt in imminent danger or bodily harm, Elkins stated "[as

6

soon as I turned around and saw the gun pointed at me." He and Hendricks dropped back behind the fender of the car. Meanwhile, Eddie pointed the gun through the closed glass door directly at the two officers. Elkins stated that "I'm telling Mr. McKenzie, Mr. McKenzie, put you gun down, put your gun down." Eddie began to back up in the house, but he still had the gun pointed toward the officers. Elkins thought that it was "imperative" that he not lose visual contact with Eddie.

¶12. Elkins then entered the house. Elkins stated that "this was all nanoseconds happening. I entered the house. I get probably not one full step and a half into the house when [Eddie] discharges [the gun] the first time." The shot did not strike Elkins. Elkins returned fire on Eddie, discharging a number of bullets. While Elkins was unsure of the number of bullets he discharged, he believed that he hit Eddie although he did not know the number of times Eddie may have been shot.

¶13. Eddie continued to face Elkins and was stepping backwards while shooting toward Elkins. Elkins explained that Eddie initially shot his gun, but he shot more than one time, "multiple times." At some point Elkins saw Eddie flinch and fall backwards inside the hallway. Meanwhile, Elkins took cover near a little refrigerator. From his position Elkins saw Eddie's feet and part of his legs on the floor. There was a blood trail on the floor. However, Elkins was unsure whether Eddie got up or crawled further back in the house. There was a pause and when Elkins peaked around the corner from his position near the refrigerator, Eddie began to shoot at him again. The shot was so close to Elkins that he felt the heat from the flash of the gun. Elkins thought that Eddie was in a sitting position since he saw Eddie's legs. Then, without exposing himself, Elkins reached and fired his gun. Another officer gave Elkins a

flashlight because he could not see down the hallway, Elkins scanned a room to his left looking for Modener and two children that were in the house.

¶14. All in all, Elkins believed that he fired seven shots, four as he entered the house and three from his oblique position. A later scene summary revealed that of the seven shots, five bullets hit Eddie. Elkins never entered the hallway area during the shooting; he fired all the shots from the kitchen area.

¶15. Elkins stated that he believed that he had the authority to enter the house for "[protection of my life and the officers' lives that was outside." He believed that his life and the lives of his fellow officers were in more "jeopardy" if Eddie was outside of Elkins's sight. Elkins stated that " I entered the residence because Mr. McKenzie at this point committed a felony at - - by threatening officers with the gun that he was pointing at us." Elkins also stated that he did not know why Eddie was backing into the house, but there were a lot of windows in the house. Elkins believed that the danger was increasing even though Eddie was backing from the door "[because if I would have allowed him to get out of my line of sight, we would have absolutely no knowledge, no control, no idea where he is going to come at or come from." Elkins thought that he had no other choice under the circumstances. In addition, Elkins stated that "I felt that my life and the lives of the other officers there on the scene were in danger." He thought that Eddie was retreating to "get a better position, better weapon, whatever the case may be. I felt that if I let him out of my sight, me and the other officers present was [sic] in dire trouble." Later, Elkins stated that he felt that Eddie pointed the gun at him in a threatening manner and that Eddie was committing a felony.

¶16.    Elkins stated that he believed that the shooting happened as a result of his duties as a police officer.  He also believed that he was acting within the guidelines of the police manual for use of firearms.

¶17.    Eddie eventually placed himself in a position to be seen by the police.  While lying on his back, Eddie puts his hands over his head.  Elkins did not see a gun, and he and two other officers walked toward Eddie.  Elkins told Eddie that he was going to roll him over to make sure that he did not have a gun underneath his body.  Then Elkins told Eddie that he was going to handcuff him and call the medics into the house for treatment.

## DISCUSSION

**I.      Whether the trial court erred in granting summary judgment in favor of the City, Howie and Hendricks as to the § 1983 claims.**

¶18.    Modener contends that the trial court erred by granting summary judgment to the City. Modener's primary argument on appeal is that the City should not have been granted summary judgment because of the police officers' failure to abide by the Columbia Police Department's policy and procedure manual and the failure to properly train and supervise the officers.

¶19.    On appeal, Modener alleges that her § 1983 claim was clarified to allege that Elkins and Howie were liable to the wrongful death beneficiaries for constitutional violations. Further Modener contends that"[t]he City was alleged to have had 'condoned' the inadequate and improper supervision and training of Elkins which led to the deprivation of federal rights, specifically the Fourth Amendment right to be safe in our own homes." Modener alleges "that this type of supervision and training amounted to a pattern or practice in violation of federal law."

¶20.    State courts have concurrent subject matter jurisdiction with federal courts over § 1983 claims.  *Martinez v. California*, 444 U.S. 277, 284, 100, S.Ct. 553, 558, 62 L.Ed.2d 481 (1980).

¶21.    Summary judgment on claims raised pursuant to § 1983 is reviewed de novo as any other summary judgment to inquire if the trial court properly granted the motion for summary judgment.  *See Mallery v. Taylor*, 805 So.2d 613, 620 (Miss. Ct. App. 2002).  *See also Jenkins v. Ohio Cas. Ins. Co.*, 794 So.2d 228, 232 (Miss. 2001) (this Court applies a de novo standard of review on appeal from a grant of summary judgment.)  The moving party has the burden of demonstrating that there is no genuine issue of material fact in existence, while the non-moving party should be given the benefit of every reasonable doubt.  *Tucker v. Hinds County.*, 558 So.2d 869, 872 (Miss. 1990).  *See also Heigle v. Heigle*, 771 So.2d 341 (Miss. 2000).  The evidence must be reviewed in the light most favorable to the non-moving party.  *See Russell v. Orr*, 700 So.2d 619, 622 (Miss. 1997); *Richmond v. Benchmark Constr. Corp*, 692 So.2d 60, 61 (Miss. 1997); *Northern Elec. Co. v. Phillips*, 660 So.2d 1278, 1281 (Miss. 1995).

### A.    The City's Liability under § 1983

¶22.    Modener contends that the trial court erred in granting summary judgment as to City. The key case establishing municipal liability under a § 1983 claim is *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  The United States Supreme Court in *Monell* stated that "Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies."  *Id*. at 690,

98 S.Ct. at 2035. In *Monell*, the Court held that a municipality could only be held liable where an action pursuant to an official municipal policy caused a constitutional tort, determining that there is no § 1983 liability on a respondeat superior theory. The court held that:

> The language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor, or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

436 U.S. at 691, 98 S.Ct. at 2036.

¶23. The Court in *Monell* further stated:

> Indeed, it is when execution of a government's policy of custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official capacity, inflicts the injury that the government as an entity is responsible under § 1983.

*Id*. at 694, 98 S.Ct. at 2037-38.

¶24. The United States Supreme Court later expanded on *Monell* in *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), addressing a municipality's liability under § 1983. In *City of Canton*, the Court held that under certain circumstances, liability for constitutional violations resulting from a municipality's failure to train its employees could result in rejecting arguments that municipal liability could be imposed only where there exists an unconstitutional policy. *Id*. at 380, 109 S.Ct. at 1200. The Court stated: "We conclude, as have all [c]ourts of [a]ppeals, that have addressed this issue that there are limited circumstances in which an allegation of 'failure to train' can be the basis for liability under § 1983." *Id*. at

11

387, 109 S.Ct. at 1204. The Court determined the degree of fault required for municipal

liability to be imposed:

> We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. This rule is most consistent with our admonition in *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037, and *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981), that a municipality can be liable under §1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under §1983. As Justice BRENNAN's opinion in *Pembaur v. Cincinnati*, 475 U.S. 469, 483-484, 106 S.Ct. 1292, 1300-1301, 89 L.Ed.2d 454 (1986) (plurality) put it: "[M]unicipal liability under § 1983 attaches where–and only where–a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. See also *Oklahoma City v. Tuttle*, 471 U.S., at 823, 105 S.Ct., at 2436 (opinion of REHNQUIST, J.). Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality–a "policy" as defined by our prior cases–can a city be liable for such a failure under § 1983.

489 U.S. at 388-89, 109 S.Ct. at 1204-05.

¶25. The Court further determined that unsatisfactory training of an officer does not, by

itself, constitute municipal liability. In adopting the "deliberate indifference" standard, the

Court concluded that:

> To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the City "could have done" to prevent the unfortunate incident. *See Oklahoma City v. Tuttle*, 471 U.S. at 832, 105 S.Ct. at 2436 (Opinion of REHNQUIST, J.) Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities-a result we rejected in *Monell*, 436 U.S. at 693-694, 98 S.Ct. at 2037. It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe

the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism. Cf. *Rizzo v. Goode*, 423 U.S. 362, 378-380, 96 S.Ct. 598, 607-608, 46 L.Ed.2d 561 (1976).

489 U.S. at 391-2, 109 S.Ct. at 1206.

¶26.   In *Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001), the Fifth Circuit

described the proof required to attribute municipal liability under § 1983 as follows:

> Under the decisions of the Supreme Court and this court, municipal liability under Section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional right whose "moving force" is the policy or custom. *Monell v. Dep't of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). *Monell* and later decisions reject municipal liability predicated on *respondeat superior*, because Section 1983 will not bear such a reading. *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997). Consequently, the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability. *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984), *cert denied*, 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985); *McKee v. City of Rockwall*, 877 F.2d 409, 415 (5th Cir. 1989), *cert denied*, 493 U.S. 1023, 110 S.Ct. 727, 107 L.Ed.2d 746 (1990).   The three attribution principles identified here – a policymaker, an official policy and the "moving force" of the policy – are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself.

*Piotrowski*, 237 F.3d at 578.

¶27.   In *Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992), the Fifth Circuit

previously held that isolated incidents alone will not subject a municipality to liability under

§ 1983:

> Allegations of an isolated incident are not sufficient to show the existence of a custom or a policy. "Isolated violations are not the persistent, often repeated constant violations that constitute and policy." To demonstrate a municipal custom or policy under § 1983, a plaintiff must at least allege: a pattern of similar incidents in which citizens were injured or endangered by intentional or

13

negligent policy, misconduct and/or that serious incompetence or misbehavior which is general or widespread throughout the police force.

*Fraire*, 957 F.2d at 1278.

¶28.   In *Piotrowski*, the court stated that "[a]ctual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Piotrowski*, 237 F.3d at 579.

¶29.   The court further held that:

Municipal liability for section 1983 violations results if a deprivation of constitutional rights was inflicted pursuant to official custom or policy. Official policy is ordinarily contained in duly promulgated policy statements, ordinances or regulations.  But a policy may also be evidenced by custom, that is:

(2)    ... a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy ...  Actions of officers or employees of a municipality do not render the municipality liable under section 1983 unless they execute official policy as above defined.

*Webster*, 735 F.2d at 841; *See also **Bryan County***, 520 U.S. at 405-07, 117 S.Ct. at 1387.

While an unconstitutional official policy renders a municipality culpable under § 1983, even a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the "known or obvious consequences" that constitutional violations would result. *Bryan County*, 520 U.S. at 407, 117 S.Ct. at 1389, 1390.  Deliberate indifference of this sort is a stringent test, and "a showing of simple or even heightened negligence will not suffice" to prove municipal culpability. *See [I]d*.  It follows that each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff, and it must be determined whether each one is facially constitutional or unconstitutional.

14

In addition to culpability, there must be a direct casual link between the municipal policy and the constitutional deprivation. *Monell* describes the high threshold of proof by stating that the policy must be the "moving force" behind the violation. *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037-2038. See also *Canton*, 489 U.S. at 389, 109 S.Ct. 1197. This court summed up the relevant standards as follows:

> *Bryan County* underscores the need for *Monell* plaintiffs to establish both the causal link ("moving force") and the City's degree of culpability ("deliberate indifference" to federally protected rights). These requirements must not be diluted, for "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability."

*Snyder v. Trepagnier*, 142 F.3d at 796, citing *Bryan County*, 520 U.S. at 410, 117 S.Ct. at 1394.

237 F.3d at 579-80.

¶30.   The court stated:

"[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that a municipal action was taken with 'deliberate indifference' to its known or obvious consequences." *Bryan County*, 520 U.S. at 407, 177 S.Ct. at 1390 (citing *Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

237 F.3d at 579-80 n. 22.

¶31.   Modener's claims against the City do not establish its liability under § 1983. Modener fails to identify any facially invalid city policy. Modener also fails to prove that there existed a persistent widespread practice or custom of unwarranted seizures by the City or its employees. Furthermore, Modener had not established that the City demonstrated any deliberate indifference to any known or obvious consequences which might result in any constitutional deprivation from execution or any city policy or any persistent, widespread

15

practice or custom. Modener has not established that causation exists between any city policy or a widespread custom or practice or that the City's policy or custom was the moving force for Elkins's actions to support any alleged constitutional violation needed to render the City liable under § 1983. We find that the trial court did not err in granting summary judgment as to the City. This issue is without merit

**B. Summary Judgment Granted to Howie and Hendricks**

¶32. The trial court granted summary judgment as to Howie and Hendricks. On appeal, the primary focus of Modener's argument addressed summary judgment for the City without arguing in detail to reverse summary judgment granted as to Hendricks and Howie.[1] This Court will address summary judgment as to Howie and Hendricks separately.

1. Summary Judgment in favor of Howie

¶33. As to Howie, the trial found that the police chief was not liable, stating:

It follows, that since the City of Columbia cannot be liable under a *respondeat superior* theory and that Modena (sic) has not established any liability under a failure to train a supervise theory, the [d]efendant[,] Chief Jerry Howie[,] is not liable, and therefore, also dismissed from this lawsuit. *See **Thompson v. Upshur County, Texas***, 245 F.3d 447, 459 (5th Cir. 2001).

¶34. The Fifth Circuit has held:

Under section 1983, supervisory officials are not liable for the actions of subordinates or any theory of vicarious liability. ***Thompkins v. Belt***, 828 F.2d 298, 303 (5th Cir. 1987). A sheriff not personally involved in the acts that deprived the plaintiff of his constitutional rights is liable under section 1983 if: (1) the sheriff failed to train or supervise the offices involved; (2) there is a causal connection between the alleged failure to supervise or train and the

---

[1] This Court addressed summary judgment as to the City separately previously in this discussion. Modener also addressed summary judgment as to Elkins which is the subject of the interlocutory appeal that will also be addressed separately.

alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to plaintiff's constitutional rights. *Smith v. Brenoetty*, 158 F.3d 908, 911-12 (5th Cir. 1998); *Doe v. Taylor Independent School District*, 15 F.3d 443, 452-54 & nn. 7-8 (5th Cir. 1994)(*en banc*)(adopting the *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1205 n. 10, 103 L.Ed.2d 412 (1989)...

Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference. *Snyder v. Trepagnier*, 142 F.3d 791, 798-99 (5th Cir. 1998); *Belt*, 828 F.2d at 304-05. The plaintiff must generally demonstrate at least a pattern of similar violations. *Snyder*, 142 F.3d at 798. Furthermore, the inadequacy of training must be obvious and obviously likely to result in a constitutional violation. *City of Canton*, 109 S.Ct. at 1205 n. 10 (1989); *Snyder v. Trepagnier*, 142 F.3d at 799. Standing alone, an expert's opinion is generally not enough to establish deliberate indifference. *Id*.

*Thompson v. Upshur County, Texas*, 245 F.3d 447, 459 (5th Cir. 2001).

¶35. Modener's proof failed to create a jury issue under this standard. Therefore, this Court finds that the trial court did not err in granting summary judgment as to Howie. This issue is without merit.

### 2. Summary Judgment in favor of Hendricks

¶36. The trial court also granted summary judgment in favor of Hendricks. While finding that Modener did not allege any violation of Eddie's constitutional rights by Hendricks, the trial court first examined whether officers were entitled to qualified immunity for constitutional violations as a defense to the § 1983 action. The trial court stated:

The current test for whether or not an officer is entitled to qualified immunity for constitutional violations was articulated by the United States Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727 (1982). "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 818, 2738. Stated another way, a plaintiff will be unable to

17

recover under § 1983 unless they can show that a governmental agent's actions violated clearly established constitutional rights of which a reasonable officer would have known.

¶37. As cited by the trial court in the case sub judice, *Glenn* provided the scope of the qualified immunity defense. *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001). In *Glenn*, the Fifth Circuit held:

> Qualified immunity protects government officials who perform discretionary functions from liability "unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Gibson*, 44 F.3d 276. The qualified immunity analysis is a two-step process. First, a court must determine whether the plaintiff has alleged the violation of a constitutional right. *Hale*, 45 F.3d at 917. Second, if the plaintiff has alleged a constitutional violation, the court must decide if the conduct was objectively reasonable in light of clearly established law at the time that the challenged conduct occurred. *Id*. "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Goodson v. Corpus Christi*, 202 F.3d 730, 736 (5th Cir.2000). This means that "[e]ven law enforcement officials who 'reasonably but mistakenly [commit a constitutional violation]' are entitled to immunity." *Id*. (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).

242 F.3d at 312.

¶38. In *Thompson*, the Fifth Circuit identified the standard for entitlement to qualified immunity. *Thompson*, 245 F.3d at 456. The court stated:

> The doctrine of qualified immunity served to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of then clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

As we said in *Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997):

18

"Where, as here, a section 1983 defendant pleads qualified immunity and shows he is a governmental official whose position involves the exercise of discretion, the plaintiff then has the burden 'to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992). We do 'not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs.' *Id*."

The first step in the qualified immunity analysis is to determine whether the plaintiff has alleged the violation of a clearly established federal constitutional (or federal statutory) right. *Hare v. City of Corinth*, 135 F.3d 320, 325 (5th Cir. 1998) (*Hare III*); *Pierce*, 117 F.3d at 872. If the plaintiff does so, the Court must then assess whether the defendant's conduct was objectively reasonable in light of clearly established law. *Hare III*, 135 F.3d at 326; *Pierce*, 117 F.3d at 872. Unlike the first step, the step two inquiry applies the law that was clearly established at the time of the alleged violation. To ensure that qualified immunity serves its intended purpose, it is of paramount import, during step two, to define "clearly established law" at the proper level of generality. *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039 97 L.Ed.2d 523 (1987); *Petta v. Rivera*, 143 F.3d 895, 899 (5th Cir. 1998); *Pierce* 117 F.3d at 872.

"Clearly established" means that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 107 S.Ct. at 3039. The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduction violated the United States Constitution or the federal statute as alleged by the plaintiff. *Id*. at 3040; *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *Pierce*, 117 F.3d at 871. The "defendant's circumstances" includes facts know to the defendant. However, because qualified immunity turns only upon the *objective* reasonableness of the defendant's acts, a particular defendant's subjective state of mind has no bearing on whether that defendant is entitled to qualified immunity. *Anderson*, 107 S.Ct. 3040, *Pierce*, 117 F.3d at 871 n. 5. An official is eligible for qualified immunity even if the official violated another's constitutional rights. *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000); *Pierce*, 117 F.3d at 872.

245 F.3d at 456-57.

¶39.   The trial court applied the two-step process set out by the Fifth Circuit in *Glenn* to determine if Hendricks were entitled to qualified immunity.  The trial court found that Modener's claim against Hendricks did not pass the first step.  The trial court held that Modener failed to allege any actions by Hendricks which constituted a constitutional violation against Eddie and dismissed all claims against Hendricks.

¶40.   The facts of this case at hand established that Hendricks was only one of the officers present at Eddie's home when the events in question transpired.  Nothing in the record points to the fact that Hendricks ever used any force against Eddie.  We find that the trial court did not err in granting summary judgment as to Hendricks.

**II.     Whether the trial court erred in dismissing Modener's state law claims.**

¶41.   The trial court dismissed Modener's "claims for negligence, gross negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, invasion of privacy, trespassing, maiming, false imprisonment, assault and assault and battery...where they do not merge into the § 1983 claim."

¶42.   The trial court stated:

> Defendants' in this case have raised several Mississippi Tort Claim Act [MTCA] defenses, but as Modena (sic) did not bring suit under the MTCA, these defenses are wholly irrelevant, and consequently dismissed.  Also dismissed are any and all of Modena's (sic) state law, negligent based tort claims, as these do not rise to the level of a constitutional tort.  *Williams v. Lee County Sheriff's Department*, 744 So.2d 286 (Miss. 1999); *Graham v. Conner*, 490 U.S. 386, 109 S.Ct. 1865 (1989).

¶43.   Modener filed her original complaint on July 14, 1998, asserting jurisdiction and venue pursuant to § 1983 for violations of the Fourth, Fifth, Sixth, Eighth and Fourteenth

Amendments of the United States Constitution. Modener also sought damages against the City, Elkins, Howie and Hendricks as a result of intentional, malicious or grossly negligent acts committed against Eddie. In response to the defendant's claims that her complaint failed to allege specific state law violations, Modener filed a motion to amend the complaint to specifically add claims of negligence and gross negligence. Attached as an exhibit to the motion to amend, Modener included the 90-day letter dated April 13, 1998, to the mayor of Columbia sent pursuant to Miss. Code Ann. §§ 11-46-1 *et seq*., to satisfy the 90-days notice requirement before filing suit.

¶44.   The trial court granted Modener's motion to amend her complaint to distinguish the state law claims from the § 1983 claims. On January 22, 2002, Modener filed her amended complaint. In the amended complaint, Modener separated her claims into three categories: negligence and gross negligence, 42 U.S.C. § 1983 and intentional torts. However, Modener did not specifically include language that the state claims were brought pursuant to MTCA or Miss. Code Ann. §§ 11-46-1, *et seq*. However, Modener did list her state law claims in the amended complaint. As Mississippi is a notice pleading state, Modener set out the necessary notice in her amended complaint required to pursue her state law claims.

¶45.   Rule 8(a)(1) & (2) of the Mississippi Rules of Civil Procedure provides:

(a)   A pleading which sets forth a claims for relief, whether an original claims, counterclaim, cross-claim, or third-party claim, shall contain:
(1)   a short and plain statement of the claim showing that the pleader is entitled to relief, and,
(2)   a demand for judgment for the relief to which he deems himself entitled. Relief in the alternative or of several different types may be demanded.

¶46.   The comment to M.R.C.P. 8 states:

21

The purpose of Rule 8 is to give notice, not to state facts and narrow the issues, as was the purpose of pleadings in prior Mississippi practice.

¶47. The MTCA is the exclusive civil remedy against a governmental entity or its employee for tortious acts or omissions which give rise to a suit. Miss. Code Ann. § 11-46-7(1) (Rev. 2002); *City of Tupelo v. Martin*, 747 So.2d 822, 826 (Miss. 1999); *Pickens v. Donaldson*, 748 So.2d 684, 687 (Miss. 1999).

¶48. The trial court erred by dismissing Modener's complaint because "Modenea (sic) did not bring suit under the MTCA," and dismissed "any and all of Modena's (sic) state law, negligent based tort claims." While Modener did not state that the negligence based state law claims were being brought pursuant to the MTCA, Modener did specify and separate the negligent, tort based state law claims from the constitutional tort claims brought pursuant to § 1983 in her amended complaint. As the MTCA, without argument, clearly operates as the exclusive remedy for the state law civil claims against a governmental entity and its employees and M.R.C.P. 8 only requires that notice of a claim be given, the trial court erred in its reasoning dismissing Modener's state law claims.

¶49. On appeal, both parties proceeded in their briefs arguing whether or not dismissal of the state law claims against Elkins, Howie, Hendricks should have been granted pursuant to the police and fire protection exemption. Miss. Code Ann. § 11-46-9 (1)(c) (Rev. 2002).

¶50. However, as the trial court granted summary judgment as to Modener's state law claims without making such a determination whether dismissal was proper pursuant to Miss. Code Ann. § 11-46-9 (1)(c), we will not now operate as the trial court to make this initial determination. *See Bender v. North Meridian Mobile Home Park*, 636 So.2d 385, 389

(Miss. 1994). *See also* **Parker v. Miss. Game & Fish Comm'n**, 555 So.2d 725, 730 (Miss. 1989). As this is an appellate court of review, we find that state law claims should be remanded back to the trial court for it to make a record as to its findings. The trial court erred in granting summary judgment finding only as to the state law claims that Modener failed to proceed under MTCA.

**III.**     **Whether Greg Elkins is entitled to qualified immunity in the shooting death of Eddie McKenzie pursuant to 42 U.S.C. § 1983.**

¶51.	The trial court determined that Elkins was not entitled to qualified immunity. The determination was based in large part upon the premise that even though Eddie pointed a gun at both Elkins and Hendricks, refused to lower his weapon when requested by police and shot the first round of fire at Elkins, Eddie was retreating and posed no immediate threat to the officers. Elkins claims that the trial court incorrectly analyzed the doctrine of qualified immunity and the "objectively reasonable" standard as it applies to the facts in this case. Further, Elkins argues that the trial court did not consider that his entry into Eddie's home was based upon exigent circumstances and within the law.

A. The trial court ruling

¶52.	The trial court ruled in pertinent part:

> The only facts that matter to the Court's analysis start when Hendricks saw Eddie pick up his firearm and end with Elkins' securing of Eddie by rolling him over and placing handcuffs on him. The only living witnesses to what occurred are Hendricks and Elkins. Therefore, since the only account as to what happened is from these two defendants, there is no factual dispute that Eddie was retreating into the back of the house when Hendricks and Elkins instructed him to put his weapon down. As Modena's [sic] counsel repeatedly tried to get Elkins to confess at his deposition, with each step Eddie took back into the house, the threat of the two officers diminished. Elkins, as shown above, stated otherwise;

[I]f I would have allowed him to get out of my line of sight, we would have absolutely no knowledge, no control, no idea where he is going to come at or come from." (Elkins' deposition, p. 137, lines 3-5). [W]hat I felt at the time-when he was retreating into his house that he was retreating to get a better position, better weapon, whatever the case may be, I felt that if I let him out of my sight, me and the other officers present were in dire trouble. (Id., p. 167, lines 4-8).

"The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. *It is not better that all felony suspects die than that they escape*. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee*, 471 U.S. at 11, 105 S.Ct. at 1701. (Emphasis added). In this case, Eddie had nowhere to escape. He was in his own house which was not physically surrounded, certainly could have been on a second's notice, given the incredible show of force displayed by the police department in their apprehension MyJellious at the McKenzie residence.

Furthermore, it stretches the imagination for Defendants' to claim that the police department's two sentence policy on the discharge of firearms in the line of duty is broad enough to encompass Elkins' actions in pursuing a retreating subject when the *immediate* danger to the officer and others diminishes with each step backwards. If that policy were broad enough to encompass Elkins' actions, then the Court would declare it an unconstitutional policy and subject the City to § 1983 liability.

As Elkins' own sworn testimony shows, he entered the house *not* because of Eddie's *immediate* threat to himself and Hendricks, but rather to some possible, future threat to all the officers present. "[T]hat he was retreating to get a better position, better weapon, whatever the case may be, I felt that if I let him out of my sight, me and the other officers present was in dire trouble." (Elkins' deposition, p. 167, lines 4-8). From Elkins' own testimony it is shown he *did not* enter the house out of any threat of *immediate* physical force against himself or Hendricks, but rather to prevent Eddie from securing *an even better position* for firing on him and the other officers.

The Court finds Judge Kozinski's dissenting opinion in *Idaho v. Horiuchi*, 215 F.3d 986 (9th Cir. 2000) (*vacated as Moot by Idaho v. Horiuchi*, 266 F.3d 979 (9th Cir. 2001)) cogent and very illuminating on this issue. In particular, Judge Kozinski asked and then answered the following rhetorical question;

Since when does taking up a defensive position justify the use of deadly force? Taking a defensive position may have kept the

24

[suspect] from being apprehended right away, but it would have posed to *immediate* threat to the officers... once inside the cabin, Harris would [not] pose an immediate threat to life and limb. Absent a threat, the FBI agents were not entitled to kill; rather, they should have employed one of the many other measures at their disposal... Once a trigger is pulled and life is taken, all these options are foreclosed; the chance for a bloodless resolution is lost. Allowing the [suspect] to take a defensive position gives [him] time to think, to consider, to weigh [his] options, to calculate the risks to [himself]... It can lead to a peaceful surrender... It is therefore immensely troubling... [to hold]... that law enforcement agents may kill someone simply to keep him from taking up a defensive position. This conclusion runs contrary to a long line of deadly force cases, all which hold that only an *immediate* threat to life and limb will justify an intentional killing by law enforcement agents. *See, e.g., Graham v. Conner*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

*Horiuchi*, 215 F.3d at 999. (Emphasis in original).
Judge Kozinski continued;

While an officer need not exhaust remote alternatives before resorting to deadly force, [citation omitted], his failure to employ an obvious non-deadly alternative can make his use of deadly force unreasonable. *See Brower v. County of Inyo*, 884 F.2d 1316, 1317-18 (9th Cir. 1989) (inquiry into reasonable non-deadly alternatives is important to establishing that deadly force was necessary to prevent escape).

*Id* at 1000.
Judge Kozinski concluded;

Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed... A desire to prevent an armed suspect from entering a place he is residing because it may be difficult to persuade him to reemerge is insufficient cause to kill him. Other means exist for bringing the offender to justice, even if additional time and effort are required... [Watering down the constitutional standard for use of deadly force] by giving officers a license to kill even when there is no immediate threat to human life, so long as the suspect is retreating to "take up a defensive

25

position" [is most troubling]. This has never been the law... anywhere I'm aware of-except in James Bond movies. Because the 007 standard for the use of deadly force now applies to all law enforcement agencies... it should make us all feel less secure.

*Id*. at 1004-05.

This is very similar to what took place in Eddie's carport that day. Hendricks saw Eddie with a firearm and she and Elkins drew their firearms. Hendricks and Elkins then took cover and instructed Eddie to drop his weapon. Instead, Eddie started retreating to the back of his house and out of Elkins' sight. Elkins' did not shoot Eddie *immediately* because he did not perceive him as an *immediate* threat to his or Hendricks safety. Elkins did not consider his options, such as securing the area or simply contacting his supervisor, Smith, *who was at the scene*. Instead, he acted without authority and training and pursued Eddie into the house. And his reason for doing this?

[I]f I would have allowed him to get out of my line of sight, we would have absolutely no knowledge, no control, no idea where he is going to come at or from." (Elkins' deposition, p. 137, lines 3-5). "[W]hat I felt at the time-when he was retreating into his house that he was retreating to get a better position, better weapon, whatever the case may be, I felt that if I let him out of my sight, me and the other officers present was in dire trouble.

*Id*., p. 167, lines 4-8).

After the initial gun battle after Eddie had been hit and fallen into the hall out of Elkins' sight, Elkins took up a superior elevated position from where he continued to fire, regardless of the fact that he could not see his target and regardless of the fact that he had no idea where Modena and the two children were located within the residence.

From Elkins' own sworn testimony this Court finds his decision to use deadly force was not objectively reasonable. Not only did he lack any training in negotiations, but by his own testimony, his actions were taken not from any immediate threat but to prevent Eddie's retreat. Finally, the Court finds that the misuse of deadly force is a clearly defined constitutional violation of which reasonable people are aware.

¶53. Qualified immunity is an available defense for police officers in § 1983 actions. *Petta v. Rivera*, 143 F.3d 895, 899 (5th Cir. 1998). *See also* **Bazan v. Hidalgo County**, 246 F.3d 481, 488 (5th Cir. 2001). In **Bazan**, the Fifth Circuit held:

> Qualified immunity protects government officials performing discretionary functions from civil damages liability if their actions were *objectively reasonable* in the light of then clearly established law. E.g., **Anderson v. Creighton**, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); **Glenn v. City of Tyler**, 242 F.3d 307, 312-13 (5th Cir.2001); **Fraire v. City of Arlington**, 957 F.2d 1268, 1273 (5th Cir.), cert. denied, 506 U.S. 973, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992). *"This means that even law enforcement officials who reasonably but mistakenly commit a constitutional violation are entitled to immunity."* **Glenn**, 242 F.3d at 312 (internal quotation marks and brackets omitted).

**Bazan**, 246 F.3d at 488 (emphasis added).

¶54. The United States Supreme Court held that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." **Tennessee v. Garner**, 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed 2d 1 (1995). In **Garner** the Supreme Court further held:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shootin

**Garner**, 471 U.S. at 11-12. However, **Garner** also held circumstances in which deadly force may be used against a suspect.

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not

constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Garner*, 471 U.S. at 11-12.

¶55.   The Fifth Circuit in *Bazan*, addressed the use of excessive force and held:

[A]ll claims that law enforcement officers have used *excessive force-- deadly or not*--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be *analyzed under the Fourth Amendment and its 'reasonableness' standard*". *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (emphasis in original).

It is clearly established law in this circuit that in order to state a claim for excessive force in violation of the Constitution, a plaintiff must allege (*1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable.*

*Ikerd v. Blair*, 101 F.3d 430, 433-34 (5th Cir.1996) (internal quotation marks, citation, and footnotes omitted). Deadly force is a subset of excessive force, *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (1998); deadly force violates the Fourth Amendment unless "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others", *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

*Bazan*, 246 F.3d at 487-88 (emphasis added).  If an "'officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others'" then "deciding what occurred when deadly force was employed obviously will control whether the [officer's] conduct was *objectively reasonable*."  *Bazan*, 246 F.3d at 492 (quoting *Garner*, 471 U.S. at 11).  As to excessive force, the "inquiry is confined to whether the [officer] was

in danger *at the moment of the threat* that resulted in the [officer] shooting [the suspect]." *Bazan*, 246 F.3d at 493.

¶56. In *Glenn*, 242 F.3d at 312, the Fifth Circuit set forth the two-step analysis to determined whether qualified immunity is applicable. The two steps, as previously noted in issue II, are (1) a court determination "whether the plaintiff has alleged the violation of a constitutional right" and (2) "if the plaintiff has alleged a constitutional violation, the court must decide if the conduct was objectively reasonable in light of clearly established law at the time that the challenged conduct occurred." *Glenn*, 242 F.3d at 312 (citing *Hale v. Townley*, 45 F.3d 914, 917 (5th Cir. 1995)).

¶57. The terms "clearly established" and "objectively reasonable" have been defined by the Fifth Circuit in *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001) as follows:

> "Clearly established" means that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 107 S.Ct. at 3039. The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff. *Id*. at 3040; *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *Pierce*, 117 F.3d at 871. The "defendant's circumstances" includes facts knowto the defendant. However, because qualified immunity turns only upon the objective reasonableness of the defendant's acts, a particular defendant's subjective state of mind has no bearing on whether that defendant is entitled to qualified immunity. *Anderson*, 107 S.Ct. at 3040; *Pierce*, 117 F.3d at 871 n. 5. An official is eligible for qualified immunity even if the official violated another's constitutional rights. *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir.2000); *Pierce*, 117 F.3d at 872.

*See also* *Whiting v. Tunica County*, 222 F. Supp. 2d 809, 815 (N.D. Miss. 2002).

¶58.    In *Payton v. New York*, 445 U.S. 573, 576, 100 S. Ct. 1371,1380, 63 L.Ed.2d 639

(1980), the United States Supreme Court held that a  search or seizure in a person's home is

"presumptively unreasonable." In *Welch v. Wisconsin*, 466 U.S. 740,750, 104 S.Ct. 2091,

2098, 80 L.Ed.2d 732 (1984), the Supreme Court stated that it hesitates "in finding exigent

circumstances , especially when warrantless arrests in the home are at issue." *Welch*, 466 U.S.

at 750.  Prior to invading or entering a home, the government has the burden to demonstrate

exigent circumstances to "overcome the presumption of unreasonableness that attaches to all

warrantless home entries." *Id.*   (citing *Payton*, 445 U.S. at 586). Indeed, in *United States v.*

*Capote-Capote*, 946 F.2d 1100, 1102-03 (5th Cir. 1991), the Fifth Circuit upheld a

warrantless entry into an apartment:

> We begin with the principle that a warrantless entry into a home is presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). *One exception to the warrant requirement is the presence of exigent circumstances, which by their urgency justify warrantless searches or arrests. See **Minnesota v. Olson**, 495 U.S. 91, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85 (1990); **Welsh v. Wisconsin**, 466 U.S. 740, 749-750, 104 S.Ct. 2091, 2097-98, 80 L.Ed.2d 732 (1984). Frequently cited examples of the types of exigent circumstances that may justify warrantless entry include hot pursuit of a suspected felon, the possibility that evidence in the residence may be destroyed or removed, and danger to the lives of officers or others in the residence. **Kirkpatrick v. Butler**, 870 F.2d* 276, 281 (5th Cir.1989). The officers, however, cannot deliberately create the exigent circumstances in an attempt to circumvent the requirements of the Fourth Amendment. *United States v. Webster*, 750 F.2d 307, 327 (5th Cir.1984); *United States v. Thompson*, 700 F.2d 944, 950 (5th Cir.1983); *United States v. Scheffer*, 463 F.2d 567, 574-5 (5th Cir.1972). Further, the mere presence of weapons or destructible evidence does not alone create exigent circumstances. *United States v. Munoz-Guerra,* 788 F.2d 295, 298 (5th Cir.1986).

*Capote*, 946 F.2d at 1102-03 (emphasis added).

¶59.    In Mississippi, this Court has held that pointing a weapon at a law enforcement officer

constitutes simple assault. *Gibson v. State*, 660 So.2d 1268 (Miss 1995) (Gibson pointed a

gun at an enforcement officer's chest, but dropped the weapon when ordered to do so by

another officer). *See also Powell v. State*, 806 So.2d 1069, 1080 (Miss. 2001); *Tate v. State*

784 So.2d 208, 212 (Miss. 2001). Miss. Code Ann. § 97-3-7 is the statute that concerns the

elements and punishment for simple assault on a law enforcement officer.[2] Pursuant to Miss

Code Ann. § 1-3-11 (Rev. 1998), "the term 'felony,' when used in any statute, shall mean any

violation of law punished with death or confinement in the penitentiary."

¶60.    This Court has also ruled on aggravated assault cases involving law enforcement

officers. In *Turner v. State*, 818 So.2d 1181, 1184 (Miss. 2002), a gun was pointed at a law

enforcement officer by Turner. He attempted to fire the weapon two times. *Id.* at 1184-85.

The gun only "clicked" with no bullets firing from the weapon, nevertheless, this Court held

---

[2]  Miss. Code Ann. § 97-3-7 concerns simple assaults and aggravated assault and states in part:

(1)    **A person is guilty of simple assault if he** (a) attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or (b) negligently causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; or (c) **attempts by physical menace to put another in fear of imminent serious bodily harm**; and, upon conviction, he shall be punished by a fine of not more than Five Hundred Dollars ($500.00) or by imprisonment in the county jail for not more than six (6) months, or both. **Provided, however, a person convicted of simple assault (a) upon a ... law enforcement officer,... while such ... law enforcement officer... is acting within the scope of his duty, office or employment... shall be punished by a fine of not more than One Thousand Dollars ($1,000.00) or by imprisonment for not more than five (5) years, or both.**

(2)    A person is guilty of aggravated assault if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; or (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; and, upon conviction, he shall be punished by imprisonment in the county jail for not more than one (1) year or in the Penitentiary for not more than twenty (20) years. Provided, however, a person convicted of aggravated assault (a) upon... law enforcement officer...while such...law enforcement officer... is acting within the scope of his duty, office or employment...shall be punished by a fine of not more than Five Thousand Dollars ($5,000.00) or by imprisonment for not more than thirty (30) years, or both.

31

that there was sufficient evidence that Turner pointed a gun at a law enforcement officer and

pulled the trigger and upheld a guilty verdict of aggravated assault pursuant to Miss. Code 97-3-

7 (2) (b). *Id.*   In addition to  Miss. Code Ann. § 97-3-15,[3] which provides circumstances in

which homicide is justifiable, the manual for the City provided instances in which a weapon

---

[3]  Miss. Code Ann.§ 97-3-15.  Justifiable homicide.

1)	The killing of a human being by the act, procurement, or omission of another shall be justifiable in the following cases:

   (a)	When committed by public officers, or those acting by their aid and assistance, in obedience to any judgment of a competent court;

   (b)	When necessarily committed by public officers, or those acting by their command in their aid and assistance, in overcoming actual resistance to the execution of some legal process, or to the discharge of any other legal duty;

   (c)	When necessarily committed by public officers, or those acting by their command in their aid and assistance, in retaking any felon who has been rescued or has escaped;

   (d)	When necessarily committed by public officers, or those acting by their command in their aid and assistance, in arresting any felon fleeing from justice;

   (e)	When committed by any person in resisting any attempt unlawfully to kill such person or to commit any felony upon him, or upon or in any dwelling house in which such person shall be;

   (f)	When committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished;

   (g)	When necessarily committed in attempting by lawful ways and means to apprehend any person for any felony committed;

   (h)	When necessarily committed in lawfully suppressing any riot or in lawfully keeping and preserving the peace.

(2)	As used in paragraphs (1)(c) and (1)(d) of this section, the term "when necessarily committed" means that a public officer or a person acting by or at the officer's command, aid or assistance is authorized to use such force as necessary in securing and detaining the felon offender, overcoming the offender's resistance, preventing the offender's escape, recapturing the offender if the offender escapes or in protecting himself or others from bodily harm; but such officer or person shall not be authorized to resort to deadly or dangerous means when to do so would be unreasonable under the circumstances. The public officer or person acting by or at the officer's command may act upon a reasonable apprehension of the surrounding circumstances; however, such officer or person shall not use excessive force or force that is greater than reasonably necessary in securing and detaining the offender, overcoming the offender's resistance, preventing the offender's escape, recapturing the offender if the offender escapes or in protecting himself or others from bodily harm.

(3)	As used in paragraphs (1)(c) and (1)(d) of this section the term "felon" shall include an offender who has been convicted of a felony and shall also include an offender who is in custody, or whose custody is being sought, on a charge or for an offense which is punishable, upon conviction, by death or confinement in the penitentiary.

may be used by an officer[4] and when discharge of firearms in the line of duty is appropriate for an officer.[5]

¶61.    The trial court found no immunity for Elkins based upon the fact that Eddie was retreating into his home.  The trial court relied upon Judge Kozinski's dissenting opinion in *Hoiuchi* as noted above in the trial court opinion.  The trial court also appears to suggest that the police department simply overreacted.  The trial court stated that "[f]rom the beginning, it appears to the [c]ourt all the officers involved overreacted."  The trial court also stated that:

> The officer's collective overreaction continued at the McKenzie's residence ultimately culminating in Eddie's death.  Whether due to the officers feeding on each others rush of adrenaline or from a simple collective dislike of the McKenzie's, from its inception, this fiasco could have been avoided altogether had one of the officer's taken charge or acted reasonably.

In addition, the trial court stated that Elkins's "actions were taken not from any immediate threat but to prevent Eddie's retreat."  Further the trial court ruled that Elkins's "decision to enter the house and use deadly force against a retreating suspect for the purposes of preventing

---

[4] The Standard Operating Procedure Manual of the City of Columbia Police Department provides in part:

10.    A member shall never brandish a weapon, or fire warning shots; nor shall he remove his weapon from its holster, other than:
- To defend himself from death or serious injury;
- To defend another person unlawfully attacked from death or serious injury;
- To effect the arrest or prevent the escape, when all other means fail, of a convicted felon, or of a person who has committed a felony in the policeman's presence;
- To kill dangerous animals, or to kill an animal so badly injured that humanity requires its release from further suffering;
- To give an alarm or to call assistance for an important purpose when no other sufficient means can be used;
- To engage in training or inspection and cleaning of the weapon.

[5]  The Standard Operating Procedure Manual of the City of Columbia Police Department provides in part:

2.    DISCHARGE OF FIREARMS IN LINE OF DUTY

Firearms are authorized only when the officer's or other persons' lives are in immediate danger or when no other means are available to restore peace.

him from taking a defensive position and not because of an *immediate* threat was objectively unreasonable."

¶62. Of critical importance in the analysis of the facts sub judice is that the trial judge failed to recognize that Eddie had pointed a loaded gun at Elkins and Hendricks and failed to lower the gun when repeatedly commanded to do so by law enforcement. Both officers testified that they repeatedly told Eddie to put down his gun. Eddie never lowered the gun. As noted above, the pointing of a weapon at a law enforcement officer is simple assault punishable by a fine up to $1,000 or by imprisonment for not more than five (5) years, or both. Miss. Code Ann. § 97-3-7. An aggravated assault, such as firing toward or shooting a law enforcement officer is punished by a fine of not more than $5,000 or by imprisonment for not more than thirty (30) years, or both. Miss. Code Ann. § 97-3-7 (2) (b). Under the facts of this case, having the gun loaded and pointed at the officers placed them in imminent threat for their lives.

¶63. Elkins stated that he felt that he was in imminent danger "as soon as I turned around and saw the gun pointed at me." The trial court limited its analysis by suggesting that the only reason that Elkins entered the house was to prevent Eddie from getting a better "defensive position" is incorrect. When Eddie began to back up in the house, he still had the gun pointed toward the officers. Elkins thought that it was "imperative" that he not lose visual contact with Eddie. .

¶64. Elkins stated that he believed that he had the authority to enter the house for "[p]rotection of my life and the officers' lives that was outside." He believed that his life and the lives of his fellow officers were in more "jeopardy" if Eddie was outside of Elkins' sight. Elkins stated that " I entered the residence because Mr. McKenzie at this point committed a

felony at - - by threatening officers with the gun that he was pointing at us." Elkins also stated that he did not know why Eddie was backing into the house, but there were a lot of windows in the house. Elkins believed that the danger was increasing even though Eddie was backing from the door "[b]ecause if I would have allowed him to get out of my line of sight, we would have absolutely no knowledge, no control, no idea where he is going to come at or come from." Elkins thought that he had no other choice under the circumstances. Elkins also believed that he was fulfilling his duties as a police officer and following the procedure outlined in the manual.

¶65.    Further, the trial court failed to recognize that police officers may enter a home without a warrant when there are exigent circumstances. *See Welch*, 466 U.S. at 749-50; *Capote*, 946 F.2d at 1102-03. Normally, entry into a home without a warrant is considered to be presumptively unreasonable. *Payton*, 455 U.S. 587. However, there are exceptions to this rule and included in the exceptions that allow warrantless entry into a home is danger to the lives of police officers. *Capote*, 946 F.2d at 1102-03. Eddie had a loaded gun pointed at Elkins and Hendricks and refused to lower the gun when repeatedly asked by the officers.

¶66.    This Court finds that Mississippi statutes and case law also support the actions of Elkins pursuant to the facts in the case sub judice. Eddie pointed a gun at police officers. This action by Eddie against a police officer is considered a felony. *See* Miss. Code Ann. § 97-3-7; *Gibson*, 660 So.2d 1268. By shooting at Elkins, Eddie committed, at least, an aggravated assault. *Turner*, 818 So.2d at 1184. Further, Miss. Code Ann.§ 97-3-15 provides for situations in which homicide is justifiable by an officer.

¶67.   Eddie fired his weapon at Elkins first and then Elkins returned fire.  After a pause, Elkins peeked around a corner at which time Eddie initiated a second round of fire.  In fact, Elkins could feel the heat from the gun blast near his face.  When fired upon a second time, Elkins without exposing himself to fire again returned fire upon Eddie.  We find that Eddie's actions placed the officers in imminent danger.  Elkins was acting within the course and scope of his duties as a police officer.  He believed that it was his duty to take the actions that he did when confronted with a situation that placed other officers and himself in danger.

¶68.   This Court finds that the trial court erred by denying Elkins summary judgment on the issue of qualified immunity pursuant to the § 1983 claim.  Elkins's actions were objectively reasonable under the facts of this case.  Accordingly, we find that the  trial court ruling should be reversed and rendered on this issue.

## CONCLUSION

¶69.   We affirm the trial court's ruling granting summary judgment for the City, Howie, and Hendricks on the 42 U.S.C. § 1983 claims.  We reverse the trial court ruling dismissing the MTCA claims and a determination of the state law claims pursuant to the MTCA, and we remand those claims to the trial court for further proceedings consistent with this opinion. Also, we reverse the trial court ruling denying summary judgment for qualified immunity to Elkins under 42 U.S.C. §  1983, and we render judgment here for Elkins based on qualified immunity as to all 42 U.S.C. § 1983 claims.

¶70.   **NO. 2002-IA-00845-SCT: REVERSED AND RENDERED.**

  **NO. 2002-CA-00853-SCT: AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

36

**PITTMAN, C.J., SMITH, P.J., WALLER AND CARLSON, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. COBB, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶71.    The majority erroneously finds that summary judgment is appropriate as to all claims presented in this consolidated appeal, save those which may fall under the Mississippi Tort Claims Act ("MTCA").  Summary judgment is not appropriate as to any of the claims presented on appeal since genuine issues of material fact exist with regard to the liability of each party defendant.  Additionally, since this Court conducts de novo review of issues involving the proper construction and application of the MTCA, there is no valid reason why this Court should not find that Modener McKenzie ("Modener") substantially complied with the MTCA. For these reasons, I respectfully dissent.

¶72.    The standard of review for the trial court's grant of summary judgment under Rule 56 of the Mississippi Rules of Civil Procedure is well established.  We have stated:

> In determining whether the trial court was proper in granting [a] motion for Summary Judgment, we must conduct de novo review.  *Allison v. State Farm Fire & Casualty Co.*, 543 So.2d 661, 663 (Miss. 1989); *Clark v. Moore Memorial United Methodist Church*, 538 So.2d 760, 762 (Miss. 1989).
> The law governing the grant or denial of a motion for summary judgment is well established. *Fracture v. Lynch Oil Co.*, 552 So.2d 195, 198 (Miss. 1988).  This Court has explained repeatedly:
>> The trial court must review carefully all of the evidentiary matters before it–admissions in pleadings, answers to interrogatories, depositions, affidavits, etc.  The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If in this view the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor.  Otherwise the motion should be denied.

37

> Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite.
>
> *Dennis v. Searle*, 457 So.2d 941, 944 (Miss. 1984). *See also, Allison*, 543 So.2d at 623; *Moore Memorial*, 538 So.2d at 762; *Short v. Columbus Rubber & Gasket Co.*, 535 So.2d 61, 63 (Miss. 1998); and *Brown v. Credit Center, Inc.*, 444 So.2d 358 (Miss. 1983).
>
> The movant is strapped with the burden of demonstrating that no genuine issue of fact exists while the non-movant is given the benefit of every reasonable doubt. *Smith v. Sanders*, 485 So.2d 1051, 1054 (Miss. 1986).

*Newel v. Hinton*, 556 So.2d 1037, 1041-42 (Miss. 1990).

¶73. Additionally, the Comment to Rule 56 of the Mississippi Rules of Civil Procedure

states:

> A motion for summary judgment lies only where there is no genuine issue of material fact; summary judgment is not a substitute for the trial of disputed fact issues. Accordingly, **the court cannot try issues of fact on a Rule 56 motion; it may only determine whether there are issues to be tried**. Given the function, the court examines the affidavits or other evidence introduced on a Rule 56 motion simply to determine whether a triable issue exists, rather than for the purpose of resolving the issue.

(emphasis added). "[T]he Motion must be overruled unless, beyond a reasonable doubt, the court believes that the plaintiff would be unable to prove any facts which would support his claim." *McFadden v. State*, 580 So.2d 1210, 1214 (Miss. 1991). Further, "[w]here doubt exists as to whether there is a genuine issue of material fact, the trial judge should err on the side of denying the motion and permitting a full trial on the merits." *Ellis v. Pows*, 645 So.2d 947, 950 (Miss. 1994). *See also Brown v. Credit Ctr, Inc.*, 444 So.2d 358, 362-63 (Miss. 1983).

¶74. Likewise, we have repeatedly held that the construction and application of the MTCA is reviewed de novo by this Court. *Wallace v. Town of Raleigh*, 815 So.2d 1203, 1206 (Miss.

2002). S*ee also* **Lee County v. Davis**, 838 So.2d 243 (Miss. 2003); **Fairley v. George County**, 800 So.2d 1159 (Miss. 2001).

I.   **WHETHER THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF THE CITY, HOWIE, AND HENDRICKS AS TO THE § 1983 CLAIMS.**

¶75.   Summary Judgment as to the plaintiff's claims against the City, Howie, and Hendricks is not proper until further discovery has been completed. The record is full of contradictory statements regarding "genuine issues of material fact;" especially, when you consider the following:

(1)   Myjellious, in his sworn deposition, admits that he has had problems with the City's police department. To protect himself from harassment, Myjellious began carrying a video-recorder in his vehicle and his father discussed the harassment with the Mayor.   During depositions, Elkins acknowledged that he was aware that Myjellious carried a video-recorder and that officers on the force had discussed it.   During depositions, Hendricks acknowledged that there were rumors at the police department regarding Myjellious' use of a video recorder during routine traffic stops.   Brumfield also acknowledged during depositions that he was aware of Myjellious' use of a video recorder to tape officers during traffic stops.  The police radio log and transcriptions evidence animosity between the officers and Myjellious;

(2)   On the day of the shooting, Myjellious was approached by Hendricks and Brumfield about the volume level of his music in his car.  Myjellious immediately began video-recording Brumfield.   After the encounter, Brumfield waited for Myjellious down the street and proceeded to pull him over;

(3)   Brumfield and Ward followed Myjellious to his home in what they consider a "pursuit."  Myjellious was then arrested;

(4)   Brumfield removed Myjellious' video-recorder from his car and retained it as "evidence," despite the pleas by the McKenzie's that the camera belonged to Modema;

(5)   The available deposition testimony of several officers at the scene of the shooting contain inconsistent statements about the events that transpired. Elkins and Hendricks claim that Eddie McKenzie ("Eddie") never exited the home with the gun.  However, Brumfield claims that Eddie pointed his firearm at the officers outside the home.  Elkins claims that the

39

alleged "shoot out" transpired in two (2) separate exchanges of fire. Brumfield claims that there was only one exchange of fire. Hendricks claims Singley witnessed the shooting inside the house. However, Singley claims that he did not witness the shooting and only officers Elkins and Smith were inside the house during the incident;

(6)     Elkins claims that Eddie was cursing and yelling at him and Hendricks. Hendricks avers that Eddie raised his voice several times, but did not curse at her or make threats;

(7)     Elkins claims that he entered the home in order to protect his own safety and the safety of other officers outside. However, he also asserts in his deposition that he entered the home in "pursuit" of a felon. He also acknowledged that he did not believe that Eddie would threaten or hurt his family; and

(8)     Elkins claims that Eddie shot at him several times. In her deposition, Hendricks asserts that Eddie only shot at Elkins once.

¶76.    Essentially, the depositions which have been taken reveal several different stories regarding the shooting. The depositions of three officers present during the shooting have still yet to be taken; those being Singley, Smith, and Ward. Furthermore, only the affidavit of Singley has been offered.

¶77.    Also, the policies and procedures in place by the City's police department at the time of the shooting are more than sketchy. In order to defeat the motion for summary judgment, the plaintiff would have to show that an action pursuant to an official municipal policy caused a constitutional tort or that a municipalities failure to train its employees amounted to a deliberate indifference to the rights of persons with whom the police came into contact. *See City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The City's police department has a written manual as to policy and procedure for an incident of this nature. However, the policies and procedures contained in this manual have been shown to be "altered by understanding" or either not enforced at all:

40

(1) The manual contains a policy pertaining to "pursuits" of suspects. This policy has been consistently unenforced as it applies to the frequent "pursuits" of Myjellious. Even Elkins purported "pursuit" of Eddie into the home is contrary to written policy which mandates that no "deadly force" be used during pursuits;

(2) The manual also makes it mandatory for Hendricks, who has not yet received requisite police and firearm training, to be accompanied by an officer while on patrol. Despite this policy, Hendricks patrolled regularly without an officer accompanying her, including the night of the shooting;

(3) The manual also requires all officers to pass requisite firearm safety and marksmanship requirements. However, only marksmanship and range record certificates for Elkins have been produced. The somewhat "symbolic" range record does not indicate what continued training Elkins received as to the use of a firearm;

(4) The manual provides that officers will be issued and use a .357 caliber weapon. Howie, the Chief of Police at the time of the incident, stated that he modified the manual by allowing Elkins to be issued and use a .40 caliber weapon. Howie asserted that as the Chief of Police he was able to modify the manual without the necessity of re-writing of modifying the written text of the manual;

(5) Even though the Defendant's expert witness attested that the policies and procedures contained in the written manual were adequate; he never addressed whether these policies were in fact the policies that the police department followed or whether some other set of policies which existed through "understanding" were the policies employed;

(6) The manual mandated that officers involved in the exchange of fire should call for back up. However, the officers present at the shooting did not immediately call for backup;

(7) The manual requires officers to secure crime scenes and secure any property taken for "evidentiary" purposes. However, the video-recorder and tape which were taken from Myjellious' car were not returned to the McKenzie family for a lengthy period of time. In fact, the tape has never been returned and the video-recorder was returned broken only after Hendricks reclaimed the camera from Ward who had been holding himself out to be the person owner of the video recorder; and

(8) The reasons specified for the seizure of the video-recorder were characterized as a routine safe keeping of the property contained in the vehicle which was to be impounded since it was used in the commission of a crime. However, the manual does not specify that impound is proper when the citation involves a noise ordinance.

Clearly, whatever written manual containing policies and procedures of the police department was not worth the paper it was written on. Just because a police department has written down "ideal" policies and procedures which comply with the constitutional rights of the citizens it protects, does not mean that those policies and procedures are the actual ones employed by in the department. Sufficient evidence has been presented to show that any written policy or procedure the police department may have had regarding the use of deadly force and pursuit of suspects, was not the policy and procedures which were employed by the department. At the very least, genuine issues of material fact exist with regard to what exactly the City's policy and procedures at the time of the shooting were with respect to pursuing a suspect, discharging a firearm, and using deadly force.

¶78. To maintain her claims, the plaintiff would need to show that the City employed a frequent and widespread practice or custom which violated citizens constitutional rights in the same or similar way that the Plaintiff's rights were violated. *See Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992). However, insufficient discovery has prevented the plaintiff from effectively presenting evidence to this effect. Despite her efforts to obtain records and documentation regarding similar incidents, the plaintiff's discovery efforts have been thwarted by the defendants who filed a motion for protective order objecting to the plaintiff's requests for production of documents relating to this element. How is one to oppose a summary judgment motion requiring such specificity, unless he is allowed access to the very documents which are suspected to provide the requisite information?

¶79. Additionally, only some discovery has been completed with regard to the claims against these defendants. The record shows that as of May 13, 2002, at least three discoverable items

had yet to be produced to the plaintiff. These items include (1) a missing audiotape containing a conversation between Investigator Singley and Modener at the hospital the night of the shooting; (2) a videotape containing footage of the crime scene investigation and the McKenzie home following the shooting; and (3) a missing videotape confiscated by the police department which was contained in the video recorder the night of the shooting which purportedly would show officers allegedly harassing Myjellious and possibly footage taken during the shooting. Additionally, the record is silent as to whether several other documents and tangible objects possessed by the defendants have been produced for the plaintiff's view. These include (1) the City of Columbia investigation file; (2) the Mississippi Highway Patrol's investigation file; (3) a list, description, and photo of those bullets recovered at the crime scene; (4) a memo from Mandick to Smith, forwarding a tape to the FBI lab; (5) the FBI's Civil Rights Division's Report; and (6) Captain Greg Elkins' personal file. Lastly, no deposition testimony has been taken from Singley, Ward, Smith, or the City. Only Singley has produced an affidavit. Their versions and remembrances of the shooting are crucial as presently an abundance of contradictory testimony exists for which no clear fact pattern can be drawn.

¶80. The defendants even filed a motion for protective order in April 2002, one month prior to the trial court's order granting summary judgment, wherein they objected to certain topics scheduled to be discussed during the City's deposition and certain requests for production of documents. On the same day as granting the defendants' motion for summary judgment, the trial court finally issued an order denying the defendant's motion for a protective order as "moot." The plaintiff never received the benefit of deposing the City or obtaining the three

documents. These discovery materials were crucial to the plaintiff's arguments in opposition of the motion.

¶81. As for those documents which were produced for the plaintiff's review; such production was not made until the Spring of 2002, when the trial court's order granting summary judgment was executed on May 13, 2002. The plaintiff had in all probability two months to review the documents before the trial court entered its order.

¶82. The plaintiff was diligent in her attempts to obtain discovery in an effort to oppose the defendants' motion. The plaintiff filed a Rule 56(f) response to the defendants' motion for summary judgment in an attempt to be afforded more time to conduct discovery before the trial court ruled on the motion for summary judgment. This response was filed in December 2001, some six months before the trial court's order granting summary judgment and before the defendants' motion for a protective order. Clearly, the Rule 56(f) response was meritorious. Under the circumstances, the plaintiff was unable to "oppose" the defendants' motion for summary judgment with mere "affidavits" since the information and documentation which all knew existed and supported their claims lay in the hands of the defendants. M.R.C.P. 56(f). Regardless of the number of affidavits the plaintiff may have been able to muster, the defendants still possessed the requisite information which was not made available to the plaintiff.

¶83. Essentially, the trial court failed to afford the plaintiff sufficient time to conduct discovery and failed to realize the magnitude of the evidence which was presented. The trial court rested its order upon the policies and procedures contained in the manual without giving due regard to the fact that those written and enumerated policies were not actually the ones

44

employed by the City's police department. Even the Chief of Police admitted in his deposition that at the time of the incident those written policies were not the "rules" per se. There can be little doubt that summary judgment was inappropriate.

**II.    WHETHER GREG ELKINS IS ENTITLED TO QUALIFIED IMMUNITY IN THE SHOOTING DEATH OF EDDIE McKENZIE PURSUANT TO 42 U.S.C. § 1983.**

¶84.    At the very least, genuine issues of material fact exist with regard to whether Elkins is entitled to qualified immunity. In order to be entitled to qualified immunity, Elkins would have to prove that his actions were "objectively reasonable." *See Glenn v. City of Tyler*, 242 F.3d 307 (5th Cir. 2001). Only a few facts are needed to illustrate why Elkins conduct was not "objectively reasonable":

(1)    When Elkins observed that Eddie had brandished a firearm, he chose not to call for back up;

(2)    Instead of waiting for more qualified personnel to handle the possible hostage situation, Elkins proceeded to "pursue" Eddie himself by entering the home;

(3)    Eddie did not exit his home with his firearm or discharge his firearm at any of the officers outside the home;

(4)    Eddie never threatened to shoot Elkins or any other officers and at all times was moving backwards away from the officer into his own home;

(5)    Even under the belief that he wounded Eddie, Elkins continued to discharge his firearm and even had time to re-load; and

(6)    In his deposition, both justifications given by Elkins for his entering the home after Eddie are not authorized by the police policy manual – those being "pursuit of a felon" and "immediate danger." He even admitted that he never believed that Modener or the children in the home were in any danger.

Neither the most "reasonable" nor "uneducated and ignorant" of individuals would perceive

Elkins's actions as "objectively reasonable" under the circumstances.

¶85. Additionally, there can be little doubt that the use of deadly force is not warranted or authorized when pursuing a suspect. *See Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1995). The majority's findings that summary judgment should have been granted in favor of Elkins, essentially goes against all such notions.

¶86. The most probable and logical explanation for why Eddie fired one shot at Elkins is he was protecting himself and his family. Eddie was a seventy (70) year old disabled man who used a cane to walk. For quite a while, Eddie and his family had been dealing with the alleged repeated harassment of Myjellious by the police department. On the day in question, the same officers which Eddie complained about harassing his son came to his house to arrest his son. Not too long before that, these same police officers with guns pulled in hot pursuit had chased an unrelated suspect through the McKenzie home while Modener and the children were inside. Along with seeing his son handcuffed, Eddie was also told that his personal property – the video recorder – was being taken into police custody as "evidence," despite his pleas that the camera was his wife's. Police officers continued to stand outside his home. When presented with all of these facts, it is not hard to imagine why Eddie felt the need to retrieve a gun and remain **in his own home** to protect the safety of himself and his family. To his surprise, a police officer came into his home with a firearm pointed directly at him. Without time to think, Eddie began backing up the hall toward the bedroom where his wife and children were located. In all probability, Eddie fired the one shot to protect himself and his family. This is even more clearer, since Eddie never threatened the officers and never threatened his family.

46

¶87. Regardless of the characterizations made by Elkins, the City, or the police department, Elkins entered that home in "pursuit" of what he believed to be a felony suspect. If he was really concerned about his own safety or the safety of the other officers outside, he would have remained outside the home and called the precinct for personnel trained to handle situations of this nature. That is what an "objectively reasonable" person would have done.

### III. WHETHER THE TRIAL COURT ERRED IN DISMISSING MODENER'S STATE LAW CLAIMS.

¶88. Although the majority correctly finds that the plaintiff's state law claims, specifically those falling under the MTCA, should be reversed and remanded to the trial court, it fails to go further under our de novo review and address the true issue – whether the plaintiff has substantially complied with the notice provision of the MTCA.

¶89. The plaintiff specifically listed her state law claims separately in her amended complaint. The plaintiff also served a notice letter upon the Mayor during the requisite time limitation provided for in the MTCA. Miss. Code Ann. § 11-46-11. Although, the plaintiff did not specifically mention in the letter that the state law claims were pursuant to the MTCA, such an omission does not support a finding of no notice. As we have repeatedly found, all that is required under the notice statute is substantial compliance, which has clearly been shown here. ***Powell v. City of Pascagoula***, 752 So.2d 999 (Miss. 1999); ***Ferrer v. Jackson County Bd. of Supvrs.***, 741 So.2d 216 (Miss. 1999); ***City of Pascagoula v. Tomlinson***, 741 So.2d 224 (Miss. 1999); ***Tennessee Valley Reg'l Hous. Auth. v. Bailey***, 740 So.2d 869 (Miss. 1999); ***Reaves ex re. Rouse v. Randall***, 729 So.2d 1237 (Miss. 1998).

47

¶90. Summary judgment was not appropriate with regard to any of the claims asserted by the plaintiff. More extensive discovery is needed before any such finding can be made. For the above-stated reasons, I respectfully dissent.