# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-CA-01106-SCT

*BARBARA CLAY, INDIVIDUALLY AND O/B/O
HER MINOR CHILDREN, D.D.C. JR., D.D.C., AND
WHITNEY JACKSON O/B/O HER MINOR
CHILDREN, D.C., D.C., AND D.C.*

*v.*

*TUNICA COUNTY, MISSISSIPPI, AND TUNICA
COUNTY SHERIFF K.C. HAMP*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/14/2022 |
| TRIAL JUDGE: | HON. LINDA F. COLEMAN |
| TRIAL COURT ATTORNEYS: | DANIEL E. MORRIS |
| | GENARA DENEE' FREEMAN-MORRIS |
| | JOHN KEITH PERRY, JR. |
| | DAVID D. O'DONNELL |
| | S. RAY HILL, III |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | DANIEL E. MORRIS |
| ATTORNEY FOR APPELLEES: | S. RAY HILL, III |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED - 05/23/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., MAXWELL AND BEAM, JJ.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Donnie Clay committed suicide on July 20, 2016, while confined in the Tunica County

Jail. Barbara Clay, Clay's wife, individually and on behalf of two of Clay's minor children

and Clay's girlfriend, Whitney Jackson, on behalf of another three minor children of Clay

(collectively, the plaintiffs), instituted this wrongful death action against Sheriff K.C. Hamp,

in his individual and official capacity, and Tunica County, alleging a violation of Clay's Fourteenth Amendment rights under 42 U.S.C. § 1983.

¶2.     After discovery was completed, defendants filed a combined motion for summary judgment. Hamp pleaded qualified immunity. Both defendants pleaded no vicarious liability action under § 1983.  The defendants contended that "neither Tunica County nor Sheriff Hamp may be held liable solely based on the alleged wrongful conduct of Jail employees. . . . [T]he Plaintiffs must present evidence in the form of deposition testimony or affidavits that establish that a policy or custom of the Tunica County Jail was the 'moving force' behind Clay's death."

¶3.     The trial court found that Hamp was entitled to qualified immunity and separately granted summary judgment to the County, finding that the plaintiffs (1) failed to identify a single policy or custom of the County as the direct cause of Clay's suicide and (2) failed to establish a causal connection between the County's alleged failure to train the jail staff and a violation of Clay's constitutional rights.  The plaintiffs appealed only the trial judge's decision to grant summary judgment in favor of the County.  We affirm.

## FACTS & PROCEDURAL HISTORY

¶4.     Around 2:22 a.m. on July 20, 2016, Tunica County Sheriff's Deputies Robert Melvin, Jaylin James, and Captain Victor Randle were dispatched to a family disturbance at Clay's residence.  The complainant was Clay's mother, Maggie Clay, who also lived at the residence.  Upon arrival,  James spoke with Maggie in the front yard.  Maggie advised him

2

that her son and his girlfriend, Whitney Jackson, were fighting inside the house. After the officers identified themselves, they entered the residence.

¶5. When asked whether she was alright, Jackson responded that she and Clay were just smoking some marijuana. Randle noticed what appeared to be fresh scratches around Jackson's neck and that she had a swollen lip. Randle also noticed that Clay appeared to have a scratch on his forehead. At the residence, Clay was calm and not talkative. Jackson was crying and being disorderly.

¶6. Jackson stepped in between Melvin and Clay when Melvin attempted to place Clay under arrest. Randle told Jackson to step aside, but Jackson refused to comply. Then, as James attempted to arrest her, she withdrew her hand while screaming, "I can't go to jail." However, the arrest was completed. Jackson was transported to the jail in James's patrol car. While in the patrol car, Jackson stated that Clay had choked her to the point that she could not breathe, but she did not want him to go to jail.

¶7. Clay also was arrested and was transported to the jail in Randle's patrol car where he continued to be calm and cooperative. Clay informed Randle that he "choked Ms. Jackson because she was trying to leave and he didn't want her to leave." Randle recounted that "[Clay] said she told him about all the men she had been with." Upon arriving to the jail around 2:45 a.m., Jackson became vocally louder, stating, "I don't have any money to bond out!" Clay interjected, stating, "[b]aby calm down you only got a misdemeanor; I know I'm going to prison, I already got an arson charge." Clay continued to be calm and cooperative

3

but Jackson resisted confinement and had to be physically restrained and put in a holding cell. Clay was informed that he was being charged with "Domestic Violence—Aggravated Assault" but that it could later be reduced to a misdemeanor. Clay replied that he was not worried, reiterating that he already had an arson charge.

¶8. Clay's booking process at the jail was uneventful, and it was video recorded. The record reveals that Deputy Jailer Rhonda Brown began booking Clay around 3:20 a.m. Brown recalled Clay's calmness as he sat next to her. As Brown was continuing the booking process, Officer Sylvester Thomas brought a group of inmates near Clay and Brown heading to the sally port to smoke. Clay asked Thomas if he could join the inmates. Brown approved.

¶9. Video evidence shows Clay smiling and calmly interacting with the other inmates. Brown later entered the sally port holding a piece of paper and approached Clay. Clay took a pen from Brown, looked over the paper, and signed it. She then returned inside to her desk. Later, Brown reentered the sally port and joined Clay and the other inmates in smoking. Then Brown, Clay, and the inmates walked back inside with Clay, stopping at Brown's desk where she completed the booking process. Clay was placed in a cell about twenty-five minutes after the booking process began.

¶10. The time was approximately 4:10 a.m. when Melvin approached Clay's cell to photograph his injuries from the altercation. Melvin encountered Clay hanging by the neck from a bed sheet attached to the ceiling of the cell. Melvin immediately notified Brown and

4

Randle. Randle instructed Deputy Jailer John Polk and Melvin to get Clay down and then to call for medical attention. All attempts to save Clay's life by deputies, jailers, and emergency medical technicians were unsuccessful.

¶11. Agent Bryan Sullivant of the Mississippi Bureau of Investigation arrived at 6:15 a.m. to investigate Clay's death.[1] An autopsy, conducted on July 21, 2016, concluded that hanging was the cause of Clay's death. The manner of death was determined to be suicide.

¶12. Nearly two years later, the plaintiffs filed a § 1983 suit against Hamp and the County, alleging that defendants violated Clay's Fourteenth Amendment rights. The plaintiffs contended that defendants were aware or should have known that Clay was vulnerable to suicide, asserting that Clay had a history of multiple suicide attempts while detained in the jail and that the defendants failed to take action to avert that risk.

¶13. Indeed, Clay was a prior detainee. Chronologically, the record discloses that in 2008 and 2009, Clay was arrested on multiple charges, resulting in detention.[2] On each occasion,

---

[1]Agent Sullivant stated in his summary of the death investigation report that:

[Clay] was lying on his back. He had on orange pants that had been cut by paramedics and a black t-shirt, also cut by paramedics. . . . [W]hite fabric was on the floor underneath [Clay's] neck. It had been cut and removed from his neck. The rest . . . was still attached to the ceiling grate above the toilet and sink area.

[2]Those charges included four counts of reckless driving, one count of first-offense DUI, one count of driving without a license, one count of disorderly conduct/breach of peace, and one count of telephone harassment.

5

a Medical Screening Questionnaire was prepared by the admitting jailer during the booking process, as directed by the jail's policy. None suggested that Clay was a suicide risk.

¶14. A 2010 detention report reveals that Clay was combative in nature.[3] He first threatened officers, then he threatened to kill himself. He then cut his own wrist with a razor. Pafford Medical Services were dispatched to the jail. When EMS arrived, they recorded that Clay violently threatened everyone in his presence. Their physical examination report reveals that Clay had a small, nonbleeding puncture wound to his left wrist, a nonbleeding abrasion to his left eyebrow, and a nonbleeding abrasion on his back from a taser. Clay was transported to an emergency room and was later returned to the jail. In the jail, Clay was confined to a lunacy cell. A watch log was prepared, and visual checks varied from thirty minutes to one-hour intervals. Clay was released two days later.

¶15. Clay returned in April 2011.[4] The medical screening record from that detention reveals no behavior or actions suggesting risk of suicide. The booking officer did conclude that Clay's behavior was suggestive of a risk of assault to the staff. The booking officer also wrote on Clay's medical screening questionnaire that Clay had received a mental psychiatric test a month prior.

---

[3]On this occasion, Clay was arrested for carrying a concealed weapon/fake weapon, resisting/obstructing arrest, public drunkenness, and disorderly conduct/breach of peace.

[4]On this occasion, Clay was arrested for disorderly conduct/breach of peace, simple assault, assault on police officer, resisting/obstructing arrest, and profanity/drunkenness in public.

¶16. Discharge instructions dated April 15, 2012, from Baptist Hospital included a recommendation from Region IV Mental Health Services that suicide precautions be taken for Clay when he was returned to jail custody.[5] Clay was discharged to the sheriff's office around 7:30 p.m. The comment section of the detention report read, "inmate placed in lunacy per Sheriff Hamp." In July 2012, Clay was arrested for a controlled substance violation. The booking officer wrote on his medical screening questionnaire that Clay had seen a psychiatric doctor two months prior. In October 2012, a booking officer recorded on Clay's medical screening that he arrived combative and failed to comply.[6] Clay was placed in a holding cell where he made threats, beat on the door, and cracked the window in the door. A watch log was prepared, and visual checks were made on Clay for one-hour intervals.

¶17. On October 24, 2013, Clay was detained.[7] He threatened to drown himself and attempted to put his head in a toilet. Clay beat and kicked the cell door, prompting officers to place him in a lunacy cell for his safety. He was released the next day. On November 18, 2013, Clay was arrested for public drunkenness and littering and was detained again. On November 29, 2013, Clay was again arrested on a public-drunkenness charge. Clay was placed in a lunacy cell where visual time checks were made on him in thirty-minute intervals.

---

[5]Clay was detained on a pending "foreign warrant; fugitive; holding."

[6]On this occasion, Clay was arrested for: disturbing the peace, public drunkenness, simple assault, and disorderly conduct/breach of peace.

[7]On this occasion, Clay was arrested for: DUI first offense, driving without a license, no insurance, possession of marijuana less than an ounce, resisting/obstructing arrest, three counts of disobedience of traffic control devices, and failure to yield.

The watch log entries reveal that he beat on the door and wall of the cell while yelling and screaming. Clay was released four days later. After this detention, no admissible evidence was presented of behavior suggesting risk of suicide.

¶18. As a result, no suicide precautions were undertaken for Clay during the two years preceding his suicide. In March 2014, Clay was detained on a charge of sale/possession/or use of a controlled substance within a correctional facility. He was released two months later. In April 2015, Clay was detained; the comment on his detention form reads "must pay fines at justice court . . . before release authorization[.]" In May 2015, Clay was arrested on a charge of possession of paraphernalia among other traffic violations.

¶19. In April 2020, defendants jointly moved for summary judgment. Defendants argued that the plaintiffs failed to present evidence showing that Hamp played any role in Clay's suicide, entitling him to qualified immunity. Defendants further contended that the plaintiffs failed to present evidence to establish that a policy or custom of the jail was the direct cause of Clay's suicide, entitling the County to summary judgment. The trial court held a hearing on July 2, 2020. On September 14, 2022, the trial court ruled that Hamp was protected by qualified immunity and granted summary judgment in favor of the County. The plaintiffs appealed the grant of summary judgment to the County.

**STANDARD OF REVIEW**

¶20. We review a grant of summary judgment de novo. *Elkins v. McKenzie*, 865 So. 2d 1065, 1071 (Miss. 2003). We review the evidence in the light most favorable to the

8

nonmoving party. *Id.* Summary judgment is appropriate if from the pleadings, depositions, answers to interrogatories, admissions, and affidavits, there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Miss. R. Civ. P. 56(c).

## DISCUSSION

**Whether the trial court erred by granting summary judgment to the County.**

¶21.    State courts have concurrent subject matter jurisdiction with federal courts over § 1983 claims. *Martinez v. California*, 444 U.S. 277, 284, 100 S. Ct. 553, 62 L. Ed. 2d 481 (1980). Section 1983 provides redress for a violation of a constitutional right or right created by federal law. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002). Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

¶22.    Municipalities and local governments, such as the County, are considered "persons" who can be held liable under § 1983. *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Congress did not intend to subject counties to liability unless an official policy caused a constitutional tort. *Id.* at 691. There is no

9

respondeat superior liability for the County under § 1983; it cannot be held liable for an injury inflicted solely by its employees or agents. *Id.* at 691, 694. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

¶23. The United States Supreme Court has held that pretrial detainees have the right to receive needed medical treatment under the Fourteenth Amendment. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 245, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983). The United States Court of Appeals for the Fifth Circuit has held that "[a] serious medical need may exist for psychological or psychiatric treatment, just as it may exist for physical ills." *Partridge v. Two Unknown Police Officers of City of Hous., Tex.*, 791 F.2d 1182, 1187 (5th Cir. 1986).

¶24. To hold the County liable, the plaintiffs must prove that (1) an official policy or custom of the County (2) directly caused Clay's constitutional injury, and (3) the County enacted or maintained such policy with deliberate indifference to the risk of such constitutional injuries. *Monell*, 436 U.S. at 691, 694; *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) ("'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.").

¶25. Additionally, "[o]fficial [county] policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread

10

as to practically have the force of law." ***Connick v. Thompson***, 563 U.S. 51, 61, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011) (citing ***Pembaur v. City of Cincinnati***, 475 U.S. 469, 480-81, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)). "The 'official policy' requirement was intended to distinguish acts of the [county] from acts of *employees* of the [county], and thereby make clear that [county] liability is limited to action for which the [county] is actually responsible." ***Pembaur***, 475 U.S. at 479.

¶26. In the case sub judice, the plaintiffs failed to identify any official policy of the County or custom that was the direct cause of Clay's suicide. The trial judge found that "[i]n each instance prior to July 20, 2016, when Mr. Clay was placed on suicide watch, he displayed a triggering factor by word [or] deed." The trial judge further found that on each prior occasion that Clay's behavior did suggest risk of suicide, Clay was placed in a lunacy cell and monitored pursuant to jail policy. The trial judge concluded that on those occasions, "the policy, regarding suicide prevention[,] was implemented on several occasions to save [Clay's] life." We agree. Moreover, the plaintiffs' argument challenging the adequacy of the jail's suicide-prevention policy is without merit. The Supreme Court has held that "[n]o decision of this Court establishes a right to the proper implementation of adequate suicide prevention protocols." ***Taylor v. Barkes***, 575 U.S. 822, 826, 135 S. Ct. 2042, 192 L. Ed. 2d 78 (2015).

¶27. The plaintiffs also contend that the County was deliberately indifferent to Clay's risk of suicide by failing to properly train and supervise jail staff in medical intake screening and

11

suicide prevention. The Supreme Court has held that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). County liability, however, is "most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. A county's failure to train its officers rises to the level of an official government policy under § 1983 only when that failure "amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (second alteration in original) (quoting *Harris*, 489 U.S. at 388).

¶28. Accordingly, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (quoting *Brown*, 520 U.S. at 409). When policymakers continue to adhere "to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger [county] liability." *Brown*, 520 U.S. at 407 (citing *Harris*, 489 U.S. at 390 n.10).

¶29. Plaintiffs argue that Brown was untrained in the jail's suicide-prevention policies because the County "developed a custom of relying solely on the observation of officers to determine suicidal vulnerability in detainees." That custom, plaintiffs contend, revealed the County's failure to train as Brown did not implement suicide precautions upon booking Clay despite his prior history in the jail. Importantly, Brown is not a named defendant in this

proceeding. Therefore, her sole alleged failure on one night is insufficient to establish a custom or pattern of behavior to hold the County liable under § 1983. Without presenting evidence sufficient to establish a genuine issue of material fact of a pattern of similar constitutional violations by untrained employees over time, plaintiffs fail to demonstrate deliberate indifference by the County.

¶30. Moreover, Plaintiffs do not present evidence sufficient to establish that the act of relying on observed behavior in determining a detainee's potential risk of suicide fails to comply with the jail's suicide prevention policy. Policy 11.03, entitled Suicide Prevention, reads, in part:

> Psychiatrists and psychologists do not agree on, nor have a demonstrated means of predicting or preventing suicide attempts by their patients, in or out of the jail setting. Your job in trying to predict and prevent suicide by inmates is not an easy task. Often our best tools in deterring suicide attempts is a caring, thoughtful word, positive reinforcement, listening to reports from fellow inmates or officers, *and observed behavior*.

Observed behavior is identified by psychological professionals as a critical tool in predicting and preventing suicide attempts, not as evidence of a failure to train as the plaintiffs argue.

¶31. The plaintiffs also introduced several certificates awarded to Brown, arguing that since none referenced suicide prevention training, she must have received no suicide prevention training. But the official policy in place, Policy 11.03, which was approved by Hamp, states that "[t]his training is often provided during on the job training . . . ." The lack of a specific certificate, without more, does not demonstrate that the County failed to train Brown in Policy 11.03.

13

¶32. Plaintiffs further contend that Brown's failure to follow Policy 4.02—Jail Admission—and Policy 4.03—Classification of Inmates—evinced a failure to train. Plaintiffs argue that those policies required Brown to review the internal records of the jail documenting Clay's prior confinements. Policy 4.02, concerning jail admission, however, does not contain any requirement that the admitting jailer review a detainee's prior confinement history while booking a detainee. That policy reads, in part, that "[m]edical, dental, mental health and suicide processing procedures also begin with admission. The admissions staff interviews the inmate and obtains as many items of information, *required by the facility's medical intake screening form*, as possible." The medical intake screening form completed July 20, 2016, asked, "[d]oes the detainee behavior suggest the risk of suicide." The question itself instructs the admissions jailer to utilize observed behavior in predicting risk of suicide on the medical intake screening, not the jail's internal records of a detainee's prior confinement.

¶33. Policy 4.03, concerning classification of inmates, reads, in part, that "[i]nmates shall be classified and housed in the least restrictive housing available without jeopardizing staff, inmates, or the public." In classifying detainees, the policy instructs the utilization of the following risk factors: (1) current offense or conviction; (2) offense history; (3) escape history; (4) institutional disciplinary history; (5) prior convictions; (6) alcohol and/or drug abuse; and (7) stability factors. Further, "inmates with confirmed or potential . . . suicide risks . . . will be placed in separate housing and observed accordingly until an official or

14

medical professional has deemed them well enough or capable of returning to their regular housing unit."

¶34. Plaintiffs presented no evidence to show that Brown failed to follow Policy 4.03. Brown, as the admitting jailer, was instructed to assign Clay the least restrictive housing available without jeopardizing the safety of himself or others. Without Clay's behavior in some way evincing a serious risk of suicide, Brown would not have been justified in assigning him an increased level of security. Plaintiffs argue that the risk factors include a detainee's prior history, but a detainee's prior disciplinary history is not equivalent to a detainee's history of suicidal vulnerability. Moreover, Clay had not been at risk of suicide during the three preceding years in the jail. Plaintiffs appear to allege that any time Clay was brought to the jail, he should have immediately been classified as an increased security risk and monitored in a lunacy cell. Such procedures, however, are not contemplated by any policy of the jail.

¶35. Assuming arguendo that Brown did fail to follow the jail's admission and classification policies, her singular alleged failure does not establish a pattern of constitutional violations over time amounting to an official policy of failing to train jail staff in jail admission and classification policies. The evidence presented reveals that when Clay's actions demonstrated a risk of suicide, the custom of the jail was to follow Hamp's approved jail policies by placing him in a lunacy cell and monitoring his behavior by keeping a watch

15

log. But when Clay's behavior did not suggest such risk, he was treated the same as any other detainee.

¶36. Additionally, Plaintiffs did not present evidence sufficient to establish that the training provided to Brown directly caused Clay's suicide. The evidence presented did not reveal that Clay was a present risk of suicide on July 20, 2016. No evidence disputes that Clay was anything other than calm and cooperative throughout the arrest, booking process, and assignment to a cell. No arresting officer believed or informed any of the jailers that Clay was combative or a suicide risk. Evidence of Clay's past detentions alone fail to establish a genuine issue of material fact that Clay was a serious risk of committing suicide that early morning in July 2016. At the time, the most recent occurrence of Clay's behavioral risk of suicide had been three years prior. Several subsequent detentions evinced no such risk assessment. Without presenting evidence sufficient to establish that the County failed to train its jailers and that its failure directly caused a constitutional deprivation, the plaintiffs failed to show that the County was deliberately indifferent to the risk of such constitutional injury.

## CONCLUSION

¶37. The plaintiffs failed to present evidence to establish that the training provided to the jail employees demonstrated deliberate indifference by the County to the potential for constitutional injuries. A singular episode of an employee's failure to follow jail policy does not establish a pattern of constitutional violations amounting to the policy of the County.

16

Brown was not a defendant in this suit. Congress did not intend for local governments to be held vicariously liable under § 1983. Brown's alleged acts or omissions are not attributable to the County based on their relationship as employer and employee for § 1983 liability. The trial judge correctly determined that the plaintiffs failed to identify an official policy of the County or custom that directly caused Clay's death. Therefore, the trial judge did not err by granting the County's motion for summary judgment.

¶38. **AFFIRMED.**

**KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**